Alfonso GONZALEZ, M.D., Appellant,

v.

**SAN JACINTO METHODIST
HOSPITAL, Appellee.**

No. 06–93–00063–CV.

Court of Appeals of Texas,
Texarkana.

Submitted March 16, 1994.

Decided June 1, 1994.

Rehearing Overruled June 14, 1994.

H. Clay Moore, Houston, for appellant.

Sherri Turner Alexander, Dallas, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

Alfonso Gonzalez, M.D., appeals from a summary judgment rendered in favor of the Hospital. Gonzalez raises four points of error in which he contends that the trial court erred by rendering summary judgment because (1) as a matter of law, the Hospital's bylaws were a binding contract and he presented evidence of a breach by the Hospital; (2) he had presented material issues of fact concerning whether the Hospital had engaged in a civil conspiracy; and, (3) he had raised a material issue of fact about whether the Hospital engaged in an illegal restraint of trade. He also contends that there is evidence raising a material issue of fact about whether the denial by the Hospital of full staff privileges was a tortious interference with the contractual and business relationships between Gonzalez and the surgeons on the Hospital's staff.

Gonzalez is an anesthesiologist who had practiced at San Jacinto Methodist Hospital for twenty-three years. The background of this case indicates that in January 1988, another doctor resigned as the Hospital's chief of anesthesiology. The Hospital administration decided that it might be more effective to contract with a group of anesthesiologists to provide services for the Hospital. The Hospital administrator approached Gonzalez on this subject; however, Gonzalez stated that he did not want to serve as chief of anesthesiology because he did not want the administrative responsibilities. The Hospital recruited another doctor, Dr. Octovio Calvillo, to serve in that position. The Hospital and Calvillo executed a contract on February 15, 1989. That contract provided Calvillo with the sole authority to schedule and provide anesthesia services for a two-year term with automatic renewal unless otherwise terminated. During this time period, yet another anesthesiologist retired, leaving Calvillo and Gonzalez as the only anesthesiologists at the Hospital.

Calvillo and Gonzalez entered into a partnership for a short period of time, until they decided that tax consequences would negatively impact their earnings. Shortly thereafter, Gonzalez alleges that Calvillo began to steer anesthesia patients away from him, and Gonzalez began to complain of this perceived injustice.

Calvillo requested Gonzalez's resignation from the anesthesia department. Gonzalez refused and counterattacked by bringing the rest of the doctors at the Hospital into the fray. Thereafter, Calvillo and Gonzalez patched up their differences sufficiently to enter into a contract under which they would both work at the Hospital until the two-year term of the anesthesia contract ended on February 15, 1991.

The Hospital put the contract out for bids because of this dispute. Both Calvillo and Gonzalez made a bid to act as the independent contractor providing anesthesia services for the Hospital. Gonzalez lost. Calvillo had already informed Gonzalez that if he obtained the contract he would no longer schedule Gonzalez for any anesthesiology duties at the Hospital. This did not impact Gonzalez's staff privileges at the Hospital, but effectively prevented any other doctors from using his services due to the exclusive nature of the contract between the Anesthesiology Association (Calvillo) and the Hospital.

Calvillo was originally a party to this lawsuit, but this portion of the suit was made final by a severance removing him from consideration.

## CONTRACT FOR STAFF PRIVILEGES

Gonzalez first contends that the trial court erred in granting the motion for summary judgment by ruling that the bylaws of the Hospital did not constitute a contract or that if a contract existed the Hospital's action denying him full staff privileges was not a breach of that contract. A certain amount of clarification is necessary. There are two different sets of bylaws. One set of bylaws is that of the Hospital itself, adopted by the governing board. There are also bylaws created by the medical staff to control the governance of the medical professionals with privileges at the Hospital. The medical staff bylaws are not part of the summary judgment evidence.

■ Gonzalez argues that the Hospital's bylaws constitute a contract because they provide the framework by which the Hospital has bound itself to operate and because he was required and agreed to abide by those bylaws in order to maintain Hospital privileges.

The Hospital contends that this case is controlled by *Weary v. Baylor University Hospital*, 360 S.W.2d 895 (Tex.Civ.App.— Waco 1962, writ ref'd n.r.e.), and its progeny. We disagree. The Hospital incorrectly characterizes the issue in *Weary* as being whether hospital bylaws constituted a contract and whether the doctor was entitled to a hearing under the bylaws. The bylaws reviewed in *Weary* were those created by the medical staff. The Waco Court concluded that they did not constitute a binding contract because the bylaws of the medical staff only permitted that staff to recommend and advise on reappointments and noted that the governing board had final authority and was under no obligation to accept or reject the recommendations of the board. Since neither the results of a hearing nor the provisions for a hearing under the medical staff bylaws were binding on the governing board and since the medical staff bylaws could not limit the power of the governing board, the court apparently concluded that no contract between the hospital and the doctor was shown. The question in the present case involves the Hospital's bylaws, created by the governing board of the Hospital, not the medical staff bylaws.[1]

The Hospital bylaws enacted by the governing board of the Hospital sets forth specific rights and duties for each physician[2] who is granted practice privileges and requires an agreement of compliance to be executed by every applicant selected for medical staff appointment. According to the Hospital bylaws, each member of the medical staff shall have appropriate authority and responsibility for the care of his or her patient in the Hospital, subject to such limitations as are contained in the Hospital bylaws, the medical staff bylaws, and any limitations attached to his or her appointment. Only members of the medical staff with admitting privileges shall admit patients to the Hospital, and no practitioners without practice privileges were allowed to be responsible for the diagnosis and treatment of any patient admitted into the Hospital. They further provide that when an appointment is not to be renewed or when privileges are to be "reduced, suspended or terminated, the applicant or staff member shall be afforded the

1. The Hospital bylaws authorize the licensed practitioners granted practice privileges to organize a medical staff and adopt bylaws, rules and regulations, which shall be subject to the approval of the board of directors.

2. Article V, Section 1 of the bylaws reads as follows:

Each member of the Medical Staff shall have appropriate authority and responsibility for the care of his or her patients in the San Jacinto Methodist Hospital, subject to such limitations as are contained in (a) these Bylaws (b) the Bylaws, Rules and Regulations of the Medical Staff and (c) any limitations attached to his or her appointment. Only members of the Medical Staff with admitting privileges shall admit patients to San Jacinto Methodist Hospital, and further, no person who is not a licensed practitioner with clinical privileges granted by the Board of Directors shall be responsible for the diagnosis and treatment of any patient who has been admitted to San Jacinto Methodist Hospital.

opportunity of a hearing before the Medical Staff."[3]

The procedural rights created in a hospital's bylaws may constitute contractual rights. *See Pepple v. Parkview Memorial Hospital, Inc.*, 536 N.E.2d 274, 276 (Ind. 1989); *Ray v. St. John's Health Care Corp.*, 582 N.E.2d 464 (Ind.App.1991); *Stiller v. La Porte Hospital, Inc.*, 570 N.E.2d 99, 103 (Ind. App.1991); Bruce I. McDaniel, Annotation, *Validity and Construction of Contract Between Hospital and Physician Providing for Exclusive Medical Services*, 74 ALR3d 1268 (1976). We find in the present case that the procedural rights under the Hospital bylaws are contractual.

■ Based upon his contractual rights, Gonzalez contends that there is a material fact issue of whether the Hospital breached the contract, thus entitling him to damages. Gonzalez contends that the Hospital breached the contract by denying him full staff privileges without any hearing. The Hospital contends that his privileges were never revoked, rescinded, or amended in any fashion. Gonzalez argues that the Hospital's act of hiring an association of anesthesiologists in an exclusive contract to provide all anesthesiology services for the Hospital, and his complete exclusion from that opportunity, is equivalent to a denial or reduction of staff privileges.

The Hospital argues that it had the right to enter into exclusive contracts for services by physicians if it deemed that to be an appropriate exercise of its duties. A hospital may decide to contract with a doctor or group of doctors for any combination of a variety of reasons. It may want to ensure round-the-clock coverage without dealing with the administrative details of such scheduling.

Courts have recognized that:

Various services traditionally provided by specialists operating hospital specialty departments may be difficult to obtain on a regular basis unless the hospital enters into an exclusive contract.

*Radiology Prof. Corp. v. Trinidad Area Health Association*, 195 Colo. 253, 577 P.2d 748, 751 (1978).

An anesthesiologist is in a somewhat precarious position in this context, as is any other specialist who provides a particular service to other doctors, such as a pathologist or radiologist.[4]

Gonzalez contends that his staff privileges are worthless if the Hospital has hired another physician or group of physicians with an exclusive contract to provide such services to all medical doctors treating the patients at the facility. *See Lewisburg Community Hosp. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991).

By the terms of the bylaws and staff privileges, the Hospital does not guarantee work for any physician nor does it limit its rights to enter into exclusive contracts and in general conduct the business of the Hospital. For example, if the Hospital chose to eliminate treatment of some specialty from the Hospital, the prior granting of staff privileges would not by implication prohibit the Hospital from making that business decision. While in the present case, the exclusive contract may have the effect of eliminating Gonzalez's work in the Hospital, it does not reduce or alter his staff privileges as such. Gonzalez also acknowledges that he could

---

**3.** The applicable language from the bylaws reads as follows:

When an appointment is not to be granted or renewed, or when privileges are to be reduced, suspended or terminated, the applicant or staff member shall be afforded the opportunity of a hearing before the Medical Staff. Such hearing shall be conducted formally under procedures adopted by the Board of Directors and contained in the Medical Staff Bylaws, Rules and Regulations to assure due process and afford full opportunity for the presentation of all pertinent information. If requested, the applicant or staff member shall be afforded a further hearing before a combined committee of the Medical Staff and the Board of Directors. This hearing shall take place within sixty (60) days following the physician's request for same.

**4.** In the context of vicarious liability review, several jurisdictions have noted that a patient's non-selection of his physician is the rule, rather than the exception, in the case of anesthesiologists, neurologists, and emergency physicians. *White v. Methodist Hospital South*, 844 S.W.2d 642, 647 (Tenn.App.1992).

still obtain work at the Hospital eye clinic. Gonzalez still has full staff privileges if he worked under the doctor with the exclusive contract or if he himself obtained the exclusive contract with the Hospital at a later time. Under these circumstances, he could immediately work in the Hospital with no restrictions on the scope of his activities.

The context of the bylaws' procedural requirements indicates that these procedures do not involve matters of administrative decisions, but rather deal with matters of professional competence and ethical conduct. The context clearly shows that it is the doctor's conduct and qualifications that are under review—not the Hospital's. (This section of the bylaws sets forth the qualifications for being on the Hospital staff; provides for the opportunity of a hearing for the staff member when his or her appointment is not to be renewed or granted or staff privileges are reduced; and provides that sex, race, color, religion, and national origin will not be a basis for denial of staff privileges.)

■ These procedures were not intended to cover cases in which a doctor's staff privileges have been affected by some administrative decision not directly involving that doctor. *See Vulcan Hart Corp. (St. Louis Div.) v. N.L.R.B.*, 718 F.2d 269 (8th Cir. 1983). For these purposes, his staff privileges were neither terminated nor reduced. *See Adler v. Montefiore Hospital Association of Western Pennsylvania*, 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). Gonzalez is not entitled to a hearing because the underlying rationale for holding a hearing is not present. In other words, there is nothing to be considered in a hearing in this situation. His staff privileges remain intact, subject only to his ability to find a way to get employment in the Hospital.[5] The purpose of such a hearing is not to override administrative decisions on the operation of the Hospital.

**TORTIOUS INTERFERENCE**

■ Gonzalez next contends that he raised a material issue of fact on the question of whether an effective denial of staff privileges constituted a tortious interference with contractual and/or business relationships between the plaintiff and the surgeons practicing at the Hospital. There is evidence that a sizable number of the surgeons practicing at the Hospital requested that Gonzalez be assigned to at least a specified percentage of their surgical procedures. Gonzalez contends that this proof indicates the existence of a contract between himself and the doctors which was interfered with by the actions of the governing board of the Hospital.

■ To maintain an action for interference with a contract, a plaintiff must establish (1) that there was a contract subject to interference; (2) the act of interference was willful and intentional and calculated to cause damages; and, (3) actual damages or loss occurred. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Armendariz v. Mora*, 553 S.W.2d 400 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.).

Until recently, the lack of justification or excuse was considered as an element of the plaintiff's cause of action. However, the court held in *Sterner* that privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof. *Sterner*, 767 S.W.2d at 690. Under that defense, which the Hospital has raised in its brief, it would be privileged to interfere in Gonzalez's contractual relations (1) if done in a bona fide good faith exercise of its own legal rights, or (2) if it had an equal or superior right in the subject matter to that of the other party. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex.1991); *Sterner*, 767 S.W.2d at 691. These issues were raised as affirmative defenses by the Hospital in its first amended answer.

---

**5.** There was an indication in the record that some of the doctors wished to have a plan whereby the admitting physician chose the anesthesiologist. The medical staff of the Hospital could seek a change in the Hospital bylaws for such an employment instead of the exclusive contract, but this is not a right that Gonzalez has under the present bylaws of the Hospital or the medical staff.

■ Exclusive contracts have generally been upheld as a reasonable exercise of a hospital's board of trustees' power to provide for the proper management of the hospital. *See Williams v. Hobbs,* 9 Ohio App.3d 331, 460 N.E.2d 287 (1983) (and cases cited therein). Some advantages of this type of contract include simplification of administration of the department, the assurance of immediate availability of anesthesiologists, simplification of patient scheduling, standardization of procedures, and enhancement of the use of expensive equipment. *See Brandon v. Combs,* 666 S.W.2d 755, 757–58 (Ky.App. 1984) (and cases cited therein). The undisputed facts set out in this case by summary judgment proof show that the Hospital clearly had a right to enter into such a contract. This constitutes a bona fide exercise of the Hospital's rights and provides a defense for this portion of the action. Although there is some summary judgment proof that the doctor who eventually obtained the anesthesiology contract may not have been acting in good faith, there is no evidence showing that the Hospital was not acting in good faith. Therefore, the exception set out by *Victoria Bank* applies.

■ In order to maintain an action for interference with a business relationship, a plaintiff must establish that (1) there was a reasonable probability of entering into a contractual relationship; (2) the hospital acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming appellant; (3) the hospital was not privileged or justified; and, (4) actual harm or damage occurred as a result. *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 565 (Tex.App.—Dallas 1989, no writ). As previously discussed, the Hospital had the right to enter into the contract. Thus, its actions were privileged or justified. Summary judgment was properly entered on these grounds.

## RESTRAINT OF TRADE

■ Gonzalez further contends that the trial court erred in granting the Hospital's

motion for summary judgment on antitrust grounds. Antitrust is the classic question of whether or not a particular entity has sufficient market power to restrain trade. The question in this case is whether Gonzalez raised factual issues requiring a jury's determination of this question or if the evidence before the trial court could permit it to come to a single conclusion. The sole argument made by Gonzalez under this point is that a conspiracy existed between the Hospital and Calvillo such as would constitute an unlawful restraint of trade. TEX.BUS. & COM.CODE ANN. § 15.05(a) (Vernon 1987). "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful." *Id.* This argument could rest in part upon the previous discussion of whether the Hospital had the legal right to enter into the contract, because if there is no evidence of any illegal or wrongful act, a charge of conspiracy to violate antitrust laws will fail. *Kingsbery v. Phillips Petroleum Co.,* 315 S.W.2d 561 (Tex. Civ.App.—Austin 1958, writ ref'd n.r.e.).

Section 15.04 of the Business and Commerce Code provides that the state Antitrust Act should be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes. TEX.BUS. & COM. CODE ANN. § 15.04 (Vernon 1987). Accordingly, it is appropriate to review federal case law in this area. Most cases uniformly hold that, before a claim of restraint of trade may be effectively made, the restrainer must have the power to cause adverse, anticompetitive effects within the relevant product and geographic markets. This case appears to be controlled by the holding in *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In that case, a board-certified anesthesiologist was denied admission to a hospital staff because the hospital had an exclusive services contract with a firm of anesthesiologists. The Supreme Court described the case as involving a "tying arrangement" because the users of the hospital's operating rooms (the tying product) were compelled to purchase the hospital's chosen anesthesiological services (the tied product).[6] In holding that an exclusive

---

**6.** Neither the question of the validity of such a contract nor any issue concerning its interference with other contracts was before the Court.

contract does not violate Section 1 of the Sherman Act, the Supreme Court said that any inquiry into the validity of such an arrangement must focus on the market in which the products are sold because that is where the anticompetitive forcing has its impact. The Court held that only if patients are forced to purchase the contracting firm's services as a result of the hospital's market power would the arrangement have anticompetitive consequences. In that case, the Supreme Court noted that at least twenty hospitals existed in the New Orleans metro area and that about seventy percent of the patients in the immediate geographic area actually went to other hospitals. The Court focused on the question of the market in which the products were sold and emphasized that its analysis focused on the hospital's sale of services to its patients rather than its contractual arrangements with the providers of anesthesiological services.[7]

Although Gonzalez attempts to attack this problem from a slightly different angle, i.e. that of conspiracy rather than tying, this is more a question of semantics than of substance. His argument is necessarily that a conspiracy caused a violation of the antitrust laws through the connection of the two services. In *Jefferson Parish*, the Supreme Court was entirely unimpressed by the fact that the hospital held thirty percent of the patients' share, concluding that this data did not establish a per se dominant market position obviating the need for further inquiry. In examining the question of unreasonable restraint, the Court inquired into the actual effect of the exclusive contract on competition.

The question in this case is, then, whether in the absence of a per se violation, Gonzalez has successfully raised an issue of material fact about whether the contract between Calvillo and the Hospital has unreasonably restrained competition. In the case of *Jeffer-*

*son Parish*, the Supreme Court reviewed records showing that the choice of anesthesiologists at the particular hospital had been limited to one of the doctors associated with that anesthesiology practice by the exclusive contract, but acknowledged that even if that contract did not exist, the range of alternatives open to the patient would be limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and number of doctors to whom it accorded staff privileges. The Court then held that "without a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made." *Jefferson Parish Hosp. Dist.*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2.

In the present case, Gonzalez states in his brief that the exclusive agreement unreasonably restrains trade by keeping him from working at the Hospital and that similar agreements at other hospitals are also restraining both him and other physicians from obtaining medical staff memberships in their areas of specialty. This allegation is supported only by Gonzalez's affidavit, which states that,

> Following February 15, 1991, I have made numerous attempts to find a position on the anesthesiology staff at hospitals located in the Pasadena area. The existence of exclusive anesthesiology service agreements with said Hospitals has been cited as a reason for not engaging my services.

The affidavit does not state that this particular agreement prevents him from obtaining work elsewhere within the market. At most, it may imply that this form of agreement has become so prevalent as to prevent an individual doctor specializing in this area from obtaining work at any hospital in the area unless he goes to work for one of the provider groups. However, it does not necessarily

---

7. Courts in other states have upheld the validity of a contract which limit the use of a hospital facility to certain specialists or which provide that all services of a particular type required by hospital patients be performed by the contracting specialists. These courts have uniformly held that such contracts are not a violation of antitrust laws so long as they are entered into in an effort to promote a high standard of medical care

and do not constitute an unreasonable restraint on competition. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Belmar v. Cipolla*, 96 N.J. 199, 475 A.2d 533 (1984); *Dattilo v. Tucson General Hosp.*, 23 Ariz.App. 392, 533 P.2d 700 (1975); *Brandon v. Combs*, 666 S.W.2d 755 (Ky. App.1984).

provide proof of an actual adverse effect on competition. We find that no factual issue concerning the question of application of the antitrust statutes has been raised by the evidence.

The judgment of the trial court is affirmed.